serves no other purpose than to indicate to the Justice to whom the case is assigned, the particular folios at which those parts of the record necessary for him to consider may be found. The same end can as well be attained by a written index to the record. As a rule the clerks of the District Court prepare the transcript of records in handwriting quite as legible as printed matter. Let the printed abstract be dispensed with. No practical good results from the writ of error. Hence we favor the abolition of that method of reaching the Supreme Court. It is cumbersome, expensive, and altogether unnecessary. In the older States it has fallen into very general disuse. An appeal is equally well adapted to every reviewable case. This is a simple, direct and comparatively inexpensive method of review. A provision for appeal and cross-appeal would answer all the ends of justice, simplify the practice, and greatly lighten the expense of litigation in the Supreme Court —consummations greatly to be desired, by the bar as well as by litigants.

## DEAN *v.* THE CITY OF DENVER.

*(In the Arapahoe District Court, July 1, 1884—Motion for new trial.)*

1. DAMAGES—COMPENSATORY. The fact that damages for personal injuries are large, does not necessarily make them punitive. For serious personal injury, large damages are only compensatory.

2. MUNICIPAL CORPORATION—OBSTRUCTION OF SIDEWALK. A municipal corporation is bound for injuries resulting from obstructions on sidewalk. An insecure coal-hole is an obstruction.

3. SAME—NOTICE. Notice to the chief of police of such obstruction is notice to the city.

ELLIOTT, J.

Notwithstanding that the damages awarded by the jury in this case are large, it cannot be said under the evidence that they are excessive; they are in no sense exemplary or punitive; indeed, they are by no means compensatory. The physical pain and mental anguish which the plaintiff has already endured can never be compensated with money, to say nothing of the certainty that these sufferings must continue for a long time, perhaps for the remainder of plaintiff's life, and the strong probability that they will cause his premature death; besides, his financial losses on account of his injury and consequent disability, were shown to be very great.

According to the testimony the excavation or coal-hole in the sidewalk where the accident occurred was so defectively covered as to make it a perfect man trap, though it appeared secure to the casual observer; this was on one of the principal streets of the city, and liable to be passed over by scores and hundreds of people every day and night; its defective condition was known to the chief of police, who discovered it in pursuit of his official duties several months before the accident; he gave notice of it to the regular policeman on that beat, and to the tenant or owner of the premises, but it does not appear that any one repaired or attempted to repair it, nor was any guard or danger signal placed about it. The plaintiff, while lawfully passing along this sidewalk, and in the exercise of all proper care on his part, was precipitated into this coal-hole by the slipping of its defective covering, whereby his hip joint was wrenched, torn and dislocated, causing him the pain and injury above stated. For nearly two years he has only been able to walk by the use of machinery and appliances concealed under his clothing, weighing eleven pounds, and these he carries constantly about with him. These are the undisputed facts. Those who censure juries for excessive verdicts against corporations should select some other case than this. Indeed, there is very little cause to complain of verdicts against this city, rendered by jurors who have to contribute to their payment. In nearly all of the damage cases against the city which I have tried, the verdicts have been either in favor of the city, or so small against it that the damages have been promptly paid without appeal. This was notably so in the Smith case, where the injury occurred by reason of a defective sidewalk. I have always maintained that this city was bound to use reasonable diligence to keep the public highways within its limits in proper repair, and that it is liable in damages to an injured party in certain cases for neglecting so to do. This doctrine has been strenuously resisted by the counsel for the city, until finally the question has been set at rest by the opinion of Chief Justice Beck in the case of *Dunsmore* v. *The City*, 4 Colorado Law Reporter, 601.

Now, unless the obligation of the city to keep sidewalks in repair is to be placed upon a different footing than its obligation in respect to streets and bridges, there is no serious diffi-

culty in determining the question of its liability in this case.

The power and authority of the city over sidewalks is conveyed by the same act, section and clause which confers like power over streets and alleys; besides, the charter confers special powers upon the city in respect to keeping sidewalks free from all encroachments and obstructions which would interfere with their proper use. The ordinances read in evidence very properly supplement the charter in this respect, and particularly charge the chief of police, along with the mayor and street commissioner, with the duty of keeping the sidewalks in a proper and safe condition. It can scarcely be necessary to argue that this coal-hole, defectively constructed or covered as it was, was an obstruction. "An obstruction is that which impedes progress." Webster.

Again, the charter places ample means at the disposal of the city for the construction of sidewalks, and for keeping them in repair. True, the expense is to be collected in a different manner, and the owner has the option to construct and repair in front of his own premises; but he must do so "in accordance with the plan detailed by ordinance, and under the supervision of the city engineer," so the power and authority are in no wise limited. And thus we have all the essentials, power and authority to keep the sidewalks in repair, or to see that it is done, and the means to execute that power. Hence arises the duty of the city to perform, from the neglect of which, in a proper case, liability attaches.

It was strongly insisted at the trial that the city did not have notice of the defect, and so was not guilty of negligence for not repairing or for not keeping the coal-hole guarded until it should be placed in a safe condition. So careful was I not to err in this matter that I charged the jury that, while the knowledge of the chief of police was not of itself notice to the city, it might be considered sufficient means of knowledge within the ready reach of the proper city officers, and that if they neglected to avail themselves of it, the city should be held liable for such neglect. This is undoubtedly sound doctrine, though, perhaps, too favorable to the city; for I am inclined to think, upon reflection—indeed, I am well satisfied now, in view of the ordinances read in evidence and the testimony of Chief Lomery as to his acts thereunder—that the

knowledge of that officer, under the circumstances, was notice to the city, and that it would not have been error to have so charged.

I need not say more; indeed, I need not have said so much, though the law requires that I should give my reasons in writing for refusing motions for new trials. Considering the importance of this case, and having a double interest in its proper determination, first, to promote the safety and security of the public highways in the city, as a matter of public policy; next, to avoid charging one citizen with burdens of taxation further than is necessary to promote such safety and security, I feel like putting myself squarely on record in reference to the matter.

The law as announced in the Dunsmore case meets the unqualified approval of my private judgment as a lawyer and a citizen. Thousands and tens of thousands of our people are rushing through our streets and thronging our sidewalks every twenty-four hours. With all the improvements that are going on, the excavations and pit-falls that are being thereby created, and the carelessness attending the same, together with violent storms, the natural decay and wear of our sidewalks and bridges, to what fearful dangers would we be exposed if some one were not charged with the duty of looking out for our protection and safety in this behalf. Upon whom should this duty fall? It is obviously a public one; the charter of the city of Denver invests the city government with an almost infinite variety of power, and in some respects its authority is apparently exclusive and unlimited; and in no instance is this more strikingly illustrated than in its power over streets, alleys, sidewalks and bridges. With these the courts seldom interfere, except to restrain actual nuisances.

In addition to the vast powers conferred on the city government, it has an annual revenue almost, if not quite, equal to the entire annual revenue of the State government, with which to discharge its duties and obligations. With an intelligent, peaceable, law-abiding and industrious people, as our people are for the most part, there is no reason on earth why the city government should not keep its streets, alleys, sidewalks and bridges in a perfectly safe condition at all times, and also provide the very best sanitary and police regulations throughout

the city, and rigidly enforce the same. All that is necessary is to faithfully apply the hundreds of thousands of dollars that come annually into the city treasury to the accomplishment of these ends. When the city government fails in respect to any of these duties, and an individual suffers thereby, justice requires that courts and juries of the people should give the individual redress by a judgment in damages, to be paid by the people whose official agents by their negligence have caused the injury. More complete and absolute justice still further requires that the negligent officials should be punished, or at least compelled to make good the public loss. Perhaps this might be arrived at by indictment; but the indictment of a nuisance gives the individual sufferer no redress; hence the remedy by civil action.

If the payment of this twenty thousand dollar verdict should stimulate our city officers to greater vigilance and diligence in promoting the public safety, the money will be well spent.

Motion for new trial denied, and judgment on verdict.

*Browne & Putnam*, for plaintiff.

*Frank Tilford* and *J. C. Stallcup*, for the city.

## CODIFICATION.

*( C. B. Seymour, in the Kentucky Law Reporter.)*

Is it desirable that the body of the law be enacted in a code? If law consists of the commands of the supreme power in a State, no reason exists making it undesirable that those commands be expressed. The one real objection to codification is that it will limit the legislative powers of the courts. By a singular fiction the courts, from time immemorial, have pretended that they simply declared the law, and did not make the law; yet we all know that this pretense is a mere fiction— as much a fiction as the losing and finding in trover, and the lease, entry and ouster in ejectment. The effect of this fiction has been to obscure the boundaries of the legislative function of the courts. In times when Parliaments were seldom called together the bulk of legislative work had to be done by the courts; in these times when Legislatures meet biennially, the legislative powers of the courts ought to be reduced to a minimum. Judicial legislation is always the making of a rule to